J-S07003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: F.F. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1173 WDA 2021 |

Appeal from the Order Entered September 9, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000067-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: S.F. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1174 WDA 2021 |

Appeal from the Order Entered September 9, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000068-2021

BEFORE:   OLSON, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED: MAY 20, 2022**

In these consolidated appeals, S.F. (Mother) appeals from the orders dated August 27, 2021, and entered on September 8, 2021, in the Court of Common Pleas of Allegheny County, which involuntarily terminated her

_____

[*] Retired Senior Judge assigned to the Superior Court.

parental rights to her sons, F.F.,[1] born in November of 2014, and S.F.,[2] born in May of 2016, (collectively, the Children), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).  After careful review, we affirm the order subject to review at Superior Court docket number 1173 WDA 2021 that involuntarily terminated Mother's parental rights to F.F.  At Superior Court docket number 1174 WDA 2021, we vacate the order terminating Mother's parental rights to S.F. and remand that matter for further proceedings consistent with this memorandum.

F.F. and S.F. are the younger of three children born to Mother, each to a different father.  Allegheny County Children Youth and Families (CYF) became involved with this family on July 23, 2015, prior to S.F.'s birth, due to concerns about Mother's substance abuse and intimate partner violence between Mother and her paramour, R.G.  N.T., 8/27/21, at 69.  CYF provided services for the family.  While CYF was working with the family, Mother, F.F., and F.F.'s older half-sibling, J.F., experienced a traumatic incident at the hands of R.G.  Specifically, R.G. abducted Mother, held her against her will for three days, and raped Mother while F.F. and J.F. were in the home.  *Id.* at 69; *see also id.* at Exhibits 4, 8.  Although Mother obtained a protection from

---

[1] By the same order, the orphans' court terminated the parental rights of D.M., F.F.'s biological father.  D.M. did not file an appeal.

[2] By the same order, the orphans' court terminated the parental rights of E.T., S.F.'s biological father.  E.T. appealed the order which we dispose of in a separate memorandum.

abuse order against R.G., she permitted him to see her and the children, culminating in an incident where R.G. severely assaulted one-year-old F.F. *Id.* at 69-70, Exhibits 4, 8. Although F.F. was experiencing seizures, Mother delayed obtaining treatment for F.F. to protect R.G. *Id.* at 70. When F.F. finally did receive medical treatment, medical staff found he had a "torn frenulum on the upper mucosa, scratch[es] on his neck and lower abdomen, irregular bruising on his back, and [had experienced a] possible near drowning." *Id.* at Exhibit 4. Mother's failure to protect F.F. ultimately resulted in an indicated finding of child abuse against her. *Id.*

On November 8, 2015, CYF obtained emergency custody and removed F.F. and J.F. from Mother's care. In February of 2016, the court adjudicated F.F. and J.F. dependent. The court placed S.F. in the protective custody of CYF when he was born approximately three months later. *Id.* at 71. The orphans' court adjudicated S.F. dependent on July 20, 2016. On June 25, 2018, the Children's dependency, and that of their half-sibling, was discharged as a result of Mother's cooperation with CYF and her completion of her family service plan (FSP) goals. *Id.* at 72.

Successful reunification was, however, short-lived. In October of 2018, CYF received another referral for this family, and the case re-opened in December of 2018, due to Mother's neglect of her own mental health. Mother also informed CYF that she was experiencing severe depression. N.T.,

8/27/21 at 72-73. In addition, CYF was concerned about Mother's general neglect and medical neglect of the Children and J.F. *Id.*

After months of providing services to Mother, CYF filed a petition to adjudicate the Children dependent. The adjudication hearing was continued multiple times after Mother and the Children failed to appear, leading to a judicial finding that Mother had avoided CYF and the court. *Id.* at Exhibit 4. On September 11, 2019, the Children were adjudicated dependent a second time because Mother did not cooperate with CYF and was not meeting the Children's needs. *Id.* at 75. The juvenile court ordered CYF to obtain an emergency custody authorization and remove the Children from Mother's care. *Id.* at Exhibit 4. CYF did so, placing the Children in foster care the following day. *Id.* at 75. According to Justine Walz, a CYF caseworker, CYF created a FSP for Mother when the case re-opened. N.T., 8/27/21, at 78-79. The following permanency objectives existed for Mother throughout the Children's dependency: undergo mental health treatment; undergo drug and alcohol treatment; participate in intimate partner violence (IPV) treatment; obtain housing; and improve parenting skills. *Id.* at 79.

On March 31, 2021, CYF filed a petition to terminate involuntarily Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). A hearing occurred on August 27, 2021,

during which Mother was represented by counsel.[3] In addition, S.F., then five years old, was represented by Renee Colbert, Esquire. F.F., then six years old, was represented by James Robertson, Esquire.

CYF presented the testimony of its caseworker, Justine Walz; Rachel Wagner, program manager in the intake department at POWER, a substance abuse outpatient treatment facility; and Sarah Ulish, placement services manager at Auberle, a non-profit social services agency. CYF entered the following exhibits into evidence, which the orphans' court admitted, in relevant part: the FSPs; the Children's dependency orders; Mother's PFA orders; and evaluations by the court-appointed evaluator, Dr. Neil Rosenblum.[4] Mother attended the virtual termination hearing and testified on her own behalf.

By order dated August 27, 2021, and entered on September 8, 2021, the orphans court terminated Mother's parental rights involuntarily to F.F. and S.F. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). On October

_____

[3] During the Children's dependency matters, the juvenile court determined the Children are Indian children pursuant to the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901 – 1963. N.T., 8/27/21, at Exhibits 4, 7. The parties agreed that CYF notified the tribe of the Children's removal from parental care, its filing of the petition to terminate parental rights, and of all court hearings in accordance with ICWA. N.T., 8/27/21, at 65. Although the tribe participated in a status conference, it did not seek to intervene. *Id.* at 66.

[4] The notes of transcript indicate the parties entered into joint written stipulations. N.T., 8/27/21, at 62. The stipulations do not appear in the certified record. The trial court in its Rule 1925(a) opinion and the parties in their briefs refer to the stipulations to establish procedural history, but none of the arguments concern the stipulations. Accordingly, their absence does not impede our appellate review.

1, 2021, Mother filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On October 21, 2021, this Court consolidated these appeals *sua sponte*. On November 29, 2021, the orphans' court filed its Rule 1925(a) opinion.

On appeal, Mother presents two issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511 (a)(1), (2), (5) and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [the Children] pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Brief at 6.

We review this appeal according to an abuse of discretion standard, as follows.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Before reaching the merits of Mother's issues on appeal, we must first address *sua sponte* whether, pursuant to 23 Pa.C.S.A. § 2313(a),[5] the orphans' court appointed legal counsel to represent the Children during the contested involuntary termination proceeding. *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). Our Supreme Court has interpreted Section

---

[5] This subsection provides as follows:

**(a)** **Child.--**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a).

2313(a) "as requiring 'that the common pleas court appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome.'" **Id.** (citing **In re T.S.**, 192 A.3d 1080, 1082 (Pa. 2018)). The failure to appoint a "'separate attorney to represent the child's legal interests constitutes structural error, meaning it is not subject to harmless error analysis.'" **Id.** (citing **In re T.S.**, **supra**; **In re L.B.M.**, 161 A.3d 172, 183 (Pa. 2017)).

The Court reiterated that "a single attorney cannot represent a child's best interest and legal interest if those interests conflict." **K.M.G.**, 240 A.3d at 1236 (citing **In re T.S.**, **supra**). As such, the Court concluded, "the orphans' court must determine whether counsel can represent the dual interests **before** appointing an individual to serve as [Guardian *ad litem*]/Counsel for a child." **Id.** (emphasis added). In addition, the Court held that "where an orphans' court has appointed a [Guardian *ad litem*]/Counsel to represent both the child's best interest and legal interest, appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict." **Id.** at 1235.

Instantly, a pre-trial order dated and filed on April 23, 2021, at S.F.'s orphans' court docket number, provided, "Office of Conflict Counsel is appointed as counsel for the child." Pre-trial Order, 4/23/21, at ¶ 2. On May 12, 2021, Attorney Colbert filed a praecipe for appearance as Child Advocate at the orphans' court docket number. Our review of the certified record reveals no other order of appointment for representation of S.F. and no other

praecipe for appearance filed at the orphans' court docket number. Indeed, Attorney Colbert served as S.F.'s sole attorney during the termination proceeding, and she advocated for the termination of Mother's parental rights as being in Child's best interest.[6] N.T., 8/27/21, at 4, 220.

We are unable to determine from the certified record the manner in which the orphans' court appointed Attorney Colbert. The order of appointment refers to the Office of Conflict Counsel, but the record does not indicate if Attorney Colbert is associated with that office. Furthermore, the order uses the term "counsel," but does not specify if it meant legal counsel, as in an attorney representing Child's preferred outcome. Moreover, the only indication of Attorney Colbert's role is her argument supporting Child's best interest, suggesting that she was serving as his guardian *ad litem*. Given that Attorney Colbert was Child's sole attorney during the involuntary termination proceeding, we have reviewed the certified record to confirm that the orphans' court determined prior to the proceeding that Child's best interest and legal interest did not conflict. Nothing in the record indicates whether the orphans' court fulfilled its duty in this regard under Section 2313(a), as construed by our Supreme Court in **K.M.G.**, 240 A.3d at 1236. Therefore, we are unable

---

[6] In this appeal, Attorney Colbert filed an appellee brief in support of the involuntary termination order.

to fulfill our duty to verify *sua sponte* that the orphans' court determined that Attorney Colbert could represent S.F.'s dual interests without conflict. **Id.**

Accordingly, we are constrained to vacate the involuntary termination decree and remand for further proceedings at docket 1174 WDA 2021. **See Interest of A.J.R.O.**, 270 A.3d 563, 570-571 (Pa. Super. 2022). On remand, we direct the orphans' court within 30 days to fulfill its Section 2313(a) duty as articulated in **K.M.G.**, **supra**, and determine whether Attorney Colbert may represent both the best interest and legal interest of S.F. If the orphans' court determines that no conflict exists between S.F.'s dual interests, then the court shall re-enter the termination order as to Mother. If the orphans' court determines that there is a conflict between S.F.'s best interest and legal interest, then the court shall appoint separate legal counsel and conduct a new involuntary termination hearing as to Mother to provide legal counsel an opportunity to advocate on behalf of S.F.'s legal interests pursuant to **K.M.G.**, 240 A.3d at 1235.

With respect to Mother's appeal at docket 1173 WDA 2021, by pre-trial order dated April 23, 2021, and filed at F.F.'s orphans' court docket number, the orphans' court appointed the Office of Conflict Counsel (OCC) "to represent the legal interests of" F.F. in accordance with 23 Pa.C.S. § 2313(a). Pre-trial Order, 4/23/21, at ¶ 1. On May 12, 2021, Attorney Robertson filed a praecipe for appearance as F.F.'s counsel. The court did not appoint a guardian *ad litem* for F.F. in the termination proceeding. Unlike the situation with S.F.,

the order of appointment is clear that the court appointed Attorney Robertson as legal counsel for F.F., which was reflected in Attorney Robertson's closing argument advocating for F.F.'s preferred outcome. Therefore, we conclude that the court complied with Section 2313(a), as interpreted by **K.M.G.**, 240 A.3d at 1235.[7]

Turning to the merits of Mother's appeal regarding F.F., the court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate pursuant to Section 2511(a)(2) and (b), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

---

[7] In this appeal, Attorney Robertson filed an appellee brief in support of the involuntary termination order.

- 11 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

*** 

23 Pa.C.S.A. § 2511(a)(2), (b).

We first consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2). Our analysis is as follows:

. . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

- 12 -

In the present case, Mother contends on appeal that CYF failed to present sufficient evidence in support of its petition to terminate her parental rights involuntarily. Mother's Brief at 18. Mother asserts that she made progress on her FSP goals. *Id.* at 19. According to Mother, CYF focused its evidence on her instability in the past, but did not establish any current deficiencies in her present ability to care for F.F. *Id.*

The orphans' court explained its decision to terminate Mother's parental rights pursuant to Section 2511(a) as follows:

> Mother's testimony regarding her more recent efforts to address her goals and her intentions to continue on her current trajectory were credible and this [c]ourt does not doubt that [M]other loves her children. Nevertheless, the totality of the record overwhelmingly supports, clearly and convincingly, that grounds for termination existed. Mother failed to make any consistent or sustained progress on her family service plan goals. Mother's unaddressed mental health [conditions] rendered her completely unable to address her goals, by her own report, and [M]other did not start to work on her goals until mid-February 2021. Mother largely faded from all contact and visitation on two occasions, from March to May 2020, and again between June/July 2020 to mid-February 2021. She did not inform anyone of her whereabouts or intentions. She did not call her children or have virtual visits during this time. She did not engage in any mental health treatment during this time. Her current housing is a three-quarters house[,][8] and she has no plan for how she seeks to obtain appropriate housing. Mother hasn't actively parented the [C]hildren for an extended period of time and the [C]hildren, upon being told to restart contact with mom, did not want to participate.

Trial Court Opinion, 11/29/21, at 17.

_____

[8] A three-quarters house is a sober living home that assists people recovering from drug or alcohol abuse as they transition out of a rehabilitation program.

The record supports the orphans' court's findings. CYF's FSP for Mother had a goal of undergoing mental health treatment because she had a history of mental health symptoms "impacting her overall functioning." N.T., 8/27/21, at 79. Mother's severe depression resulted in her neglect of the Children's needs and their second removal from her care in September 2019. Mother then did not address her mental health until February of 2021, one month prior to the filing of the TPR petitions. *Id.* at 81. At the time of the termination hearing, Mother had not completed a mental health treatment program. *Id.*

Mother was to attend drug and alcohol counseling due to her history of alcohol abuse. *Id.* at 82. Ms. Walz explained that CYF made referrals to the Pennsylvania Organization for Women in Early Recovery (POWER) for Mother in July of 2015, February of 2016, and August of 2019. CYF also provided multiple in-home services and a family support partner service. *Id.* at 79, 82. Nevertheless, Mother resumed drinking, including an incident in July 2019 where police found her intoxicated and took her to the hospital, but Mother had no recollection of the incident. *Id.* at Exhibit 4. A month after F.F. was adjudicated dependent a second time, Mother completed an updated POWER assessment which recommended Mother attend intensive outpatient treatment three days a week. *Id.* Ms. Walz testified that Mother attended only one day a week and reported that she attended Alcoholics Anonymous (AA) meetings but did not provide documentation. *Id.* Eventually, Mother

stopped attending the POWER program and tested positive for cocaine in November of 2019. *Id.* As of March 31, 2021, the date the TPR petitions were filed, Mother had not completed any drug or alcohol programs. *Id.*

With respect to Mother's housing goal, Ms. Walz testified that Mother had a history of homelessness and evictions. N.T., 9/27/21, at 87. CYF offered in-home services and made multiple referrals to two organizations who provided housing and rental assistance. *Id.* at 88. Ms. Walz also testified that there were two periods of time, March through May of 2020, and June or July of 2020, through February 2021, where CYF did not know where Mother was residing, and she was avoiding CYF. *Id.* at 89. As of the date of the termination hearing, Mother resided in a three-quarter house. *Id.* at 88.

Mother also had a goal to attend parenting classes and to visit with F.F. During the time period where Auberle was supervising Mother's visits with F.F., Mother attended thirty-three out of a possible seventy-eight visits. N.T., 8/27/21, at 22-23. During those visits, Ms. Walz observed that Mother "didn't have any structure or didn't have any boundaries. Didn't really have any expectations or discipline practices to [sic] much. There was just a lot of [in]consistency that would cause him to act out and not listen really." *Id.* at 106. Notably, Mother did not consistently visit with F.F. in January and February of 2020, and Mother did not visit at all from February 1, 2020, until April of 2021. *Id.* at 52.

- 15 -

Thus, the record clearly establishes that Mother has had repeated difficulties with mental health, drug and alcohol abuse, maintaining stable housing, and adequately parenting Children. Her repeated incapacity has left F.F. without essential parental care. Contrary to her argument, the orphans' court did not abuse its discretion in considering her extensive history of struggles in evaluating whether she could remedy her incapacity. As discussed *supra*, F.F. first came into care at age one after Mother protected F.F.'s abuser instead of promptly obtaining medical help for him. An attempt at reunification collapsed after Mother struggled with her mental health and substance abuse. F.F. has spent most of his life in foster care while Mother has attempted to remedy her parental incapacity. She disappeared for an eight to nine month stretch during F.F.'s second time in foster care. Although Mother has attempted to remedy her incapacity, she has been unable to achieve a sustained period of stability. At the time of the termination hearing, she was not close to reunifying with F.F. "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Based on the foregoing, we conclude the orphans' court did not err in concluding that she is unable to remedy her incapacity, notwithstanding her recent engagement with services.

Given Mother's long history of services and CYF involvement, our review of the record supports the findings of the orphans' court that Mother's

incapacity, abuse, neglect, or refusal has deprived F.F. of essential parental care, control or subsistence, and that Mother cannot or will not remedy the conditions and causes of her incapacity, abuse, neglect, or refusal. We discern no error of law or abuse of discretion, and we affirm the termination of Mother's parental rights pursuant to Section 2511(a)(2).

Because the trial court found that Mother's conduct warranted termination pursuant to Section 2511(a), it was required to analyze the Children's needs and welfare pursuant to Section 2511(b), in order to terminate Mother's parental rights. The statutory provision provides:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

This Court has stated, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases

where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case."

*In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

In considering the affection which a child may have for his or her natural parents, this Court has stated the following:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. Moreover, the Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an

obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

On appeal, Mother argues that the orphans' court erred when it determined that there was sufficient evidence to terminate her parental rights under Section 2511(b). Specifically, Mother contends that F.F. had only been in his foster home for two months at the time of the hearing and that he was experiencing difficulties. Mother's Brief at 22-23. Mother also avers that F.F. spent significant time in Mother's care, and they share a strong bond. *Id.* at 23.

The orphans' court determined that Mother and F.F. do not share a strong emotional bond and explained:

> At the time of the termination proceeding, F.F. was six years and ten months old. Joint Exhibit 1- Stipulations. Removed from his mother's care when he was brutally assaulted after his first birthday, he spent twenty-two months in foster care. *Id.* When he was returned to his mother, he was almost three years old. *Id.* Nearly two years later, F.F. was removed again and had been in foster care the last twenty-three months. *Id.*
>
> His foster care caseworker described F.F. as "typically more reserved" during his visits with mother. T.T. at 27. When mother failed to attend her scheduled visits, the foster care caseworker testified that "[F.F.] definitely has more of a delayed reaction. Immediately he gets quiet and kind of shuts down when he knows visits are going to be canceled. But his delayed reactions have been some violent behaviors. Defiance. Just kind of screaming at the foster parent." *Id.* There was nothing presented to this court that this child has a strong emotional bond with his mother.

Orphans' Court Opinion, 11/29/21, at 19.

The trial court's conclusion that Mother and F.F. do not share a necessary and beneficial relationship is supported by the record. Ms. Ulish explained that while visiting with Mother, F.F. "can get very hyper" and is "not easily redirected." N.T., 8/27/21, at 27. Ms. Ulish testified further that at the time of the termination proceedings, F.F. was in a pre-adoptive foster home. *Id.* at 32. After Mother's long period of absence, F.F. re-started visitation with Mother and began to display aggressive behavior in his foster home. *Id.* at 32-33. Prior to visiting with Mother, F.F. was not violent. *Id.* at 33. Ms. Ulish testified that F.F. called the foster parents mom and dad almost immediately after arriving and that he "respond[s] really well to the foster parents. [He] has told me that [he] like[s] being in the foster home and [he] want[s] to stay there." *Id.* at 34.

Ms. Walz testified that she cannot identify a benefit that F.F. experiences through his relationship with Mother and explained that he gets "a little bit of peace of mind that they are able to see that their mom is okay maybe. But [F.F.] will basically ignore her." N.T., 8/27/21, at 107. Ms. Walz opined that

> . . .[T]he detriment of terminating her parental rights and discontinuing any contact is far outweighed by the benefits and the peace of mind and the stability that it would provide the kids. The majority of their life has been chaos and turmoil and trauma since their birth. [S.F. and F.F.] have spent more time. . . really out of her care than in her care. And when they have been in her care, it's been so unstable that they haven't been able to make any progress on themselves."

*Id.* at 107-108.

Finally, we reject Mother's contention that F.F. will be irreparably harmed by the termination of her parental rights. Ms. Ulish testified that because F.F. has "gone through so many stretches of no contact with [Mother] that I don't believe termination would irrevocably harm [F.F.] as well." N.T., 8/27/21, at 31. Based on the record, the trial court did not err in concluding that Mother's inconsistent presence and parenting of F.F. has caused F.F. to experience difficult behaviors. Although F.F. was only in his pre-adoptive home for a short period, the foster parents are committed to F.F. and can offer him the security that Mother cannot. Accordingly, we affirm the order involuntarily terminating Mother's parental rights as to S.F. pursuant to Section 2511(a)(2) and (b).

Order involuntarily terminating Mother's parental rights to F.F. and subject to appeal at Superior Court docket number 1173 WDA 2021 shall be affirmed. Order involuntarily terminating Mother's parental rights to S.F. and subject to appeal at Superior Court docket number 1174 WDA 2021 shall be vacated and the case remanded for further proceedings consistent with this memorandum. Appellate jurisdiction relinquished.[9]

_____

[9] Since we have vacated the order involuntarily terminating Mother's parental rights to S.F. and remanded the case for entry of a new order after a no-conflict determination or, alternatively, appointment of conflict-free counsel to advocate the legal and best interests of S.F. at an entirely new termination proceeding, it is appropriate that we relinquish appellate jurisdiction. *See Interest of A.J.R.O.*, 270 A.3d at 571 (relinquishing appellate jurisdiction where termination order has been vacated and case

*(Footnote Continued Next Page)*

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/20/2022

---

remanded for no-conflict determination or, alternatively, new termination proceeding).